STATE OF FLORIDA, ex rel. C. D. McIVER, J. H. ARMSTRONG, G. W. ARNOLD, T. G. ELLIS and MONROE BRANNING, v. C. E. SWANK, City Manager, J. S. NEWBERN, Clerk and Treasurer, H. G. FANNIN, Mayor, and R. H. GRAY, J. R. ASBELL, WILL J. COOK and J. WILL BROWN, as and constituting the City Commission of the City of Panama City, Florida, a municipal corporation organized and existing under the laws of the State of Florida.

12 So. (2nd) 605                                    January Term, 1943
March 19, 1943                                               Division B
Rehearing Denied April 5, 1943

*Caldwell, Meginniss & Parker* and *Marion B. Knight,* and *Leo L. Foster,* for appellants.

*Ross & Isler* and *Thomas Sale,* for appellees.

SEBRING, J.:

Relators were members of the police department of the City of Panama City. As such members, they occupied a civil service status under the civil service law of Panama City, which gave to them the right to hold such office or employment during good behavior. See cc. 20049 and 20052, Sp. Acts 1939.

Under this civil service law the board of city commissioners had sole authority to terminate the employment of members of the police department, whenever an excessive number of employees existed in such department. The section of the law concerning such termination of employment provided, in essence, that "when it appears to the city manager, . . . that an excessive number of persons [are] employed in their respective departments [of city government, the city manager] . . . shall so certify this fact to the city commissioners, who shall investigate the things so certified and after the city commissioners are of the opinion that an excessive number of persons are employed" in such department, "then the city commissioners shall have the right to discharge" such excessive employees. Such discharged persons shall thereupon "be placed on a preferred list of the board of civil service"; and thereafter, in case of a vacancy,

such persons "shall be employed in their respective order as to rank and seniority . . ." See Sec. 25, cc. 20049 and 20052, Sp. Acts 1939, *supra.*

At a regular meeting of the city commission held on July 26, 1940, the city manager certified to the city commission that there was an excessive number of employees in the police department of the City, and recommended the discharge of seven such employees. Five of the seven employees recommended for discharge are now the relators in this action.

After the communication of the city manager naming the persons to be discharged was presented to the city commission, that body passed a resolution reciting that, "Whereas, an investigation has been made in accordance with the law, and the city commissioners being satisfied that the certificate of the city manager . . . is correct and proper, now, therefore, Be It Resolved by the City Commission of Panama City, that the aforesaid employees and each and every one of them, be notified by the city manager that their services are concluded effective July 31, 1940."

Pursuant to that resolution, the employment of the relators was terminated on July 31, 1940, leaving only two persons remaining in the department: the chief of police, and one police officer who had the same rating in point of rank and seniority as the relators in this action.

After the discharge of relators under the resolution of July 26, 1940, the relators tendered their services as police officers, from day to day, and have kept themselves available for reemployment in the police department, until the institution of this suit.

In June, 1941, the Legislature of the State. of Florida enacted Chapters 21474 and 21475, Sp. Acts 1941, which expressly repealed the 1939 Civil Service Law (Chs. 20049 and 20052, *supra*) and expressly declared that "the offices created thereunder are hereby abolished." By a companion act which became law at the same time, the Legislature set up a new civil service system for the City of Panama City; the statute, in the main, being identical in its provisions with that of the Civil Service Law of 1939. See Ch. 21476, Sp. Acts 1941.

After the said Acts of 1941 became law, the City of Panama City employed five new men as police officers; the relators not being considered for reemployment. Then, it was, that the relators instituted mandamus proceedings against appellees herein, attacking the good faith of the city commissioners in entering its suspension order in July, 1940; and demanding that their civil service status and rank as police officers be restored to them, that their right to a continuation of employment be established under the 1941 Act, and that they be permitted to recover back salaries for the time they claim to have been illegally suspended.

Upon return being filed to the alternative writ, the trial court denied a motion for peremptory writ the return notwithstanding, and took testimony on the facts presented by the pleadings. At the conclusion of the trial, the lower court entered its judgment quashing the alternative writ of mandamus, "but without prejudice to the relators to bring appropriate action to recover whatever salaries they would have earned between the effective date of their illegal discharge in 1940 and the effective date of the 1941 Repealing Act." By this same order, it also made certain findings of fact as a basis for its judgment.

Such findings as are pertinent to this appeal were:

1. "The 1939 Civil Service Law contemplated an actual bona fide investigation to determine if there was in fact an excessive number of employees in any department of the City Government, when that fact was Certified to the Commission by the City Manager, . . ."

2. "There was no inqury of any kind made, or any hearing of any nature held by the City Commission at that meeting, to determine whether or not the statement contained in the City Manager's letter, concerning excessive employees in the Police Department, was true or not."

3. "The discharge of the Relators by Respondents in 1940 was illegal, and . . . Relators are entitled to recover from the City the salaries they would have earned between the date of their illegal discharge and the effective date of the 1941 Repealing Acts; but that relief cannot be afforded them in this

action, because in Mandamus proceedings the Peremptory Writ must conform to the Alternative Writ."

It appears from the trial judge's order that his judgment in the matter was predicated upon his findings that relators were illegally discharged. If our conclusion is to the contrary, that will necessarily put an end to the matter; for if relators were *legally* discharged they have no standing in court, and other questions raised become immaterial. We shall proceed, therefore, to consider that feature of the case.

The trial judge's analysis of Section 25 of the 1939 Civil Service Law for Panama City, as appears from his order, undoubtedly led him to the conclusion that before employees in the city government could be discharged under Section 25 of the Act, it was necessary that a formal hearing or investigation should be held; and this, only *after* the city manager had certified the facts to the city commission. We do not concur in this analysis. As we construe Section 25 of the Statute, all that is required in such situation is that the board of city commissioners shall have knowledge of the facts at hand, and if from those facts they are of the official opinion that an excessive number of employees are employed in the departments of the government, the board shall have the right to discharge them. Nothing is said in Section 25 about a formal hearing to be held; and although in most instances it would be entitrely proper to hold one, especially if anyone asked to appear and be heard, we do not think such a hearing is necessary or indispensable to proper and valid action. 43 C.J. 679.

We are not dealing here with a large municipality where members of the governing body of the city see each other but infrequently, and then, more often than not, only at official meetings. Here we are dealing with the small community, where city commissioners see each other almost daily.

It must be a matter of common knowledge that in the small community, such things as the bonded debt, millage rates, appraised property valuations, taxes, expenses of government and the state of the treasury to meet them, whether there are too many, or not enough, employees on the payroll,

and many other such details of local government—all are general topics of conversation wherever small-town functionaries meet and exchange conversation in passing. With such opportunity for daily contact with each other, city officials of a small community bring to the discharge of their official duties a considerable knowledge of the details of their government not necessarily gained from formal meetings in council halls. That the city commissioners in this case had an intimate knowledge of the municipal affairs of their city is clearly shown by the evidence. To say, therefore, that the only manner in which the city commissioners in this case could have lawfully discharged the relators as excessive employees was to have conducted a formal hearing and investigation on the matter *after* such fact had been duly certified to them by the city manager, is ascribing to Section 25 a construction that we do not think is warranted under the circumstances.

We are not unmindful of the fact that the salutary purpose of all civil service laws is to safeguard the faithful, honest and competent employee or official from removal for unworthy causes; and such laws should be so construed, if possible, as effectively to produce that result. State ex rel. Bauder v. Markle, 107 Fla. 742, 142 So. 822. But when duly elected city commissioners meet as an official body and find by official resolution the existence, or non-existence, of any fact within the authority of such official body to determine, *after* the matter has been duly brought to their attention, as was done in this case, we think that finding of fact is conclusive of the matter and must stand, no matter how the information upon which they acted came to their knowledge; unless it be shown, at least prima facie, that such city officials acted in bad faith and from improper motive, or that the information upon which they acted was in fact untrue.

There was some effort on the part of the relators to show that the city commissioners acted in bad faith in taking the course that they pursued; but we think that respondents' case fairly met and overcame it.

It was shown that respondents were prominent and successful business men of many years' residence in Panama

City. They had been "drafted" by various business groups to offer themselves for public office upon a platform that if elected they would put the affairs of the City on a sound and going business basis. When they took office on March 1, 1940, the City then owed past due open accounts of more than $60,000.00 with less than $600.00 to meet them; to say nothing of a bonded debt of over Two Million Dollars.

Faced with this situation, they at once began an intensive study of how best to effect economies without at the same time impairing the functions of government. To that end, the city manager had been instructed to make recommendations for reductions in personnel in furtherance of such a course of action.

On March 22, 1940, the city commission, on recommendation of the city manager, had reduced the payroll of the city by discontinuing the services of the city engineer and his helper, two members of the police department, and one office clerk. Before the suspension order on July 26, 1940, was put into effect, it was known that the police force would thus be reduced to only two members. But these two, together with other law enforcement officers from the sheriff's office of Bay County, the constables of the various justice of peace districts in the area, and a member of the State highway patrol on duty in Bay County (making nine in all) would be sufficient, so it was thought, to give adequate police protection to the City.

After the suspension order was entered and the relators relieved from duty there was no rise in the crime rate or in law enforcement problems. Only after a sudden influx of transient workers many months later, who came to Panama City to build Government air bases and Army camps and to work in shipyard construction, did it become necessary, in the opinion of the city officials, to increase the personnel of the police department. By this sudden influx, what had been a quiet, peaceful little tourist city of 11,000 population became, almost overnight, a bustling construction city of 18,000 people, teeming with activity. Then it was that five more men were added to the police force of Panama City.

In the meantime, the 1939 Civil Service Law had been re-

pealed by the 1941 Acts. All offices created thereunder had been thereby abolished, and a new civil service system had been set up in its stead. Chs. 21474, 21475, 21476, Sp. Acts, 1941, *supra*.

As against this case made by respondents, some showing was made by relators that before the meeting of the city commission on July 26, 1940 an abortive effort had been made by the police to suspend two of the relators from office for alleged dereliction of duty. The City civil service board, clothed under the 1939 law with sole authority to deal with review of such matters, had refused to sustain the charges preferred against the two men by the chief of police, and had certified its ruling to the city commission. When the ruling of the civil service board was duly presented to the city commission, at its July 26th meeting, the city commission had refused to adhere to the ruling of the civil service board, although it had no authority under the statute to do otherwise. Instead, it had passed a resolution to the effect that it had found, upon investigation, that the actions of the civil service board were not well-founded and that the board had acted in good faith. By the same resolution, it directed the city manager to disregard the findings of the civil service board and to discharge the two relators, the findings of the civil service board to the contrary notwithstanding.

Immediately after this action upon the matter, it had then taken up for consideration the recommendation of the city manager that seven members of the police force (including the five relators in this action) be discharged as excessive employees, and had acted favorably upon the recommendation.

This, contends relators, together with the fact that with the reduced personnel of the police force only two police officers were then left to police a city of 11,000 population, evidences bad motive and a lack of good faith on the part of the respondents in entering their suspension order.

We agree with relators that the action of the City Commission in attempting to override the ruling of the civil service board on the matter of the charges preferred against the two relators was decidedly improper. Under the 1939 civil

service law, it was entirely without the authority of the city commisioners to pursue such action. The determination of such matter was solely for the civil service board. See Sec. 26, cc. 20049 and 20052, Sp. Acts 1939, *supra.*

But when this one unwarranted instance is weighed against the great mass of testimony adduced by respondents, we cannot but say that, taken all in all, the evidence weighs much more heavily in favor of respondents on the issue presented.

As we have heretofore stated, the passage of the 1941 legislation herein referred to repealed the 1939 Civil Service Law of Panama City and "abolished all offices created thereunder." The effect of the 1941 law, therefore, was to bring to an end such rights as relators had as employees under the 1939 law. This is so for the reason that relators had no vested or contractual right to office or employment, after the Legislature had acted so as to cut them off. State ex rel. Gibbs v. Couch, 139 Fla. 353, 190 So. 723.

As is so succinctly stated by the trial judge, in his order "In 1939 the Legislature of Florida gave these relators their status as civil service employees of the City of Panama City, and the rights incident thereto. In 1941, the Legislature of Florida took away that status and those rights. . . the Legislature had the power to do this if it saw fit. This is a case where the Legislature gave and the Legislature took away."

We conclude, therefore, that the trial court's judgment in quashing the alternative writ was proper, and that in this particular it must be affirmed. We think, however, that the finding that relators were illegally discharged is not sustained by the evidence. That part of the judgment must be reversed, therefore, with directions that jurgment be entered finally quashing the alternative writ, *with prejudice* to the rights of relators to recover for the compensation allegedly due, and that judgment be entered for respondent.

It is so ordered.

BUFORD, C. J., BROWN and THOMAS, JJ., concur.