WILLIAMS, J.
 

 | defendant, JPD Energy, Inc., appeals the district court’s ruling denying its motion for summary judgment and granting summary judgment in favor of plaintiffs, Vernon D. Adams and Glenda P. Adams. For the reasons that follow, we affirm.
 

 FACTS
 

 In 2008, JPD Energy, Inc. (“JPD”), an independent landman company, was retained by Chesapeake Exploration, L.L.C. (“Chesapeake”) to obtain mineral leases in areas in and around the “Haynesville Shale Play” in Northwest Louisiana. Plaintiffs, Vernon D. Adams and Glenda P. Adams, are the owners of a seven-acre tract of land in Caddo Parish. In February 2008, Jeff Pierce, a representative of JPD, contacted Vernon Adams regarding acquiring a mineral lease on his property. Subsequently, Pierce and plaintiffs met to discuss the terms of the lease. According to Vernon Adams, he and Pierce had agreed,
 
 inter alia,
 
 to include a depth limitation provision in the lease and that Adams would be paid royalties in the amount of one-fourth (25%) of production.
 

 The mineral lease was executed on February 22, 2008. The terms of the lease gave JPD the right to explore for minerals at any depth beneath the leased property. Additionally, the royalty provision of the lease stated:
 

 * * *
 

 4. The royalties to be paid by Lessee are: (a) on oil, and other hydrocarbons ...,
 
 one-eighth
 
 of that produced and saved from said land ...; (b) on gas, including casinghead gas, or other gaseous substance produced from said land and sold or used, ... the royalty shall be
 
 one-eighth
 
 of the amount realized from such sale ...; (c) on all other minerals mined and marketed,
 
 one-eighth,
 
 either in kind or value at the well or mine, at Lessee’s 12election[.]
 

 [[Image here]]
 

 After executing the lease, Adams stated that he read the lease “real slow to try to comprehend all of it.” At that point, he realized that the terms he and Pierce had allegedly agreed upon had not been included. During a deposition, Adams testified as follows:
 

 1. Pierce never informed him that JPD was working for Chesapeake;
 

 2. Pierce proposed a royalty of one-fourth (25%) on production, with a bonus
 
 *753
 
 of $250 per acre; Adams requested a bonus in the amount of $850 per acre.
 

 3. Pierce agreed to include a depth limitation provision in the lease, limiting the leased area from the surface to the base of the Cotton Valley formation.
 

 4. Pierce agreed to exclude all surface operations because Adams did not want a well drilled on his property.
 

 5. Pierce ended the meeting, stating that he would “check with his boss” about the terms of the lease, have a new lease typed and bring it back to Adams.
 

 6. Adams understood Pierce to mean that he agreed with the terms he and Adams had discussed and the only thing he needed to “check with his boss” about was the amount of the bonus per acre.
 

 7. Pierce returned a few days later with a lease, informing Adams that “his boss” had rejected the $350 bonus proposal, but was willing to pay $300 per acre.
 

 8. Pierce assured Adams that the clauses that they had agreed upon in their meeting — one-fourth (25%) royalty, depth limitation and no surface use— had been included in the lease.
 

 9. Due to his poor eyesight, he was unable to read the lease at that time, but he “trusted [Pierce] all the way.”
 

 Pierce signed an affidavit in which he stated that in February 2008, helmet with Vernon and Glenda Adams “to discuss [a] leasing opportunity.” Pierce also stated that he offered Adams a royalty of “one-fifth, which was the standard royalty that JPD paid at that time for leases[.]” Pierce further attested that Adams accepted the one-fifth royalty, and that he never offered Adams a one-fourth royalty. Additionally, Pierce stated that the lease “incorrectly stated that the royalty to be paid to Mr. and Mrs. Adams was a one-eighth royalty ... [but] should have provided instead for the one-fifth royalty that had been agreed upon[.]”
 

 On May 22, 2008, Adams and his wife, Glenda P. Adams, filed a petition to rescind the mineral lease on the grounds of fraud, error and failure of cause. In the alternative, plaintiffs alleged that they are entitled to reformation of the lease, on the ground of mutual error, to contain a one-fourth (25%) royalty and a depth limitation. JPD answered the petition and admitted that the royalty provision was incorrectly stated in the lease. JPD alleged that the parties had agreed to a one-fifth (20%) royalty, rather than one-eighth royalty specified in the lease. JPD also admitted that Adams requested that the lease exclude surface operations on his property, and Pierce informed Adams that JPD was agreeable to a clause prohibiting surface usage. However, JPD denied plaintiffs’ allegation that the parties had agreed to include a depth limitation.
 

 On April 27, 2009, JPD moved for summary judgment, requesting reformation of the lease “to reflect a royalty of one-fifth; and dismissing the remainder of the plaintiffs’ claims against JPD.” JPD argued that plaintiffs’ claims of fraud and unilateral error were negated by their admission that |4they did not read the lease before signing it. With regard to plaintiffs’ request to reform the lease, JPD argued that the lease should be reformed to include a one-fifth (20%) royalty, rather than the one-fourth (25%) royalty requested by plaintiffs.
 

 Plaintiffs filed a cross-motion for summary judgment, arguing that “the lease is null and void, and subject to cancellation, due to the failure of the parties to have any meeting of the minds regarding the royalty percentage.” Plaintiffs also argued that, based upon JPD’s admissions, there was no genuine issue of fact with regard to the nullity of the lease, and JPD
 
 *754
 
 failed to submit any evidence to prove its claim that the parties agreed to a one-fifth (20%) royalty.
 

 Following a hearing, the district court denied JPD’s motion for summary judgment, granted plaintiffs’ cross-motion for summary judgment and entered a judgment declaring the mineral lease “null, void and cancelled.” The court noted that the lease agreement stated that the amount of royalties would be one-eighth of production; Adams testified that he was under the impression that the royalties would be one-fourth of production; and JPD stated that the royalty provision should have stated one-fifth of production. Therefore, the court concluded that the lease was null because there was no “meeting of the minds as far as what the royalties were going to be.”
 

 JPD appeals.
 

 DISCUSSION
 

 JPD contends the district court erred in granting summary judgment |ñin favor of plaintiffs. JPD argues that plaintiffs were entitled to summary judgment rescinding the lease only if the evidence established that there was a lack of a “meeting of the minds” with regard to the amount of royalties.
 

 A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant.
 
 Samaha v. Rau,
 
 2007-1726 (La.2/26/08), 977 So.2d 880;
 
 Duncan v. USAA Ins. Co.,
 
 2006-368 (La.11/29/06), 950 So.2d 544; See also LSA-C.C.P. art. 966. Appellate courts review summary judgments
 
 de novo,
 
 while considering the record and all reasonable inferences drawn from the record in the light most favorable to the non-movant.
 
 Hines v. Garrett,
 
 2004-0806 (La.6/25/04), 876 So.2d 764;
 
 Austin v. Bundrick,
 
 41,064 (La.App.2d Cir.6/30/06), 935 So.2d 836. Summary judgment is warranted only if there is no genuine issue of material fact and the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(C)(1). In
 
 Hines, supra,
 
 our supreme court stated:
 

 In ruling on a motion for summary judgment, the judge’s role is not to evaluate the weight of the evidence or to determine the truth of the matter, but [is] to determine whether there is a genuine issue of triable fact. All doubts should be resolved in the non-moving party’s favor. A fact is material if it potentially insures or precludes recovery, affects a litigant’s ultimate success, or determines the outcome of a legal dispute. A genuine issue is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for a trial on that issue and summary judgment is appropriate.
 

 Id.
 
 at 765-66.
 

 The burden of proof remains with the movant. LSA-C.C.P. art. 966(C)(2). However, if the movant will not bear the burden of proof at trial |fion the matter that is before the court on the motion for summary judgment, the movant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense.
 
 Id.
 
 Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
 
 Id.
 

 A mineral lease is a contract by which the lessee is granted the right to explore for and produce minerals in consideration of the payment of a rental or bonus.
 
 *755
 
 LSA-R.S. 31:114;
 
 Odom v. Union Producing Co.,
 
 243 La. 48, 141 So.2d 649 (La.1961);
 
 Winnon v. Davis,
 
 32,988 (La. App.2d Cir.5/15/00), 759 So.2d 321. A mineral lease is governed by the Mineral Code. LSA-C.C. art. 2672. However, LSA-R.S. 31:2 provides:
 

 The provisions of [the Mineral] Code are supplementary to those of the Louisiana Civil Code and are applicable specifically to the subject matter of mineral law. In the event of conflict between the provisions of this Code and those of the Civil Code or other laws the provisions of this Code shall prevail. If this Code does not expressly or impliedly provide for a particular situation, the Civil Code or other laws are applicable.
 

 Thus, courts have usually applied the general rules of contract interpretation when interpreting contracts involving mineral rights. See,
 
 Stephenson v. Petrohawk Properties, L.P.,
 
 45,296 (La.App.2d Cir.6/2/10), 37 So.3d 1145, citing
 
 Blanchard v. Pan-OK Production Co., Inc.,
 
 32,764 (La.App.2d Cir.4/5/00), 755 So.2d 376,
 
 writ denied,
 
 2000-1297 (La.6/23/00), 765 So.2d 1043. Like contracts in general, a mineral lease is ]7the law between the parties and regulates their respective rights and obligations.
 
 Stephenson, supra; Winnon, supra.
 

 A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished. LSA-C.C. art. 1906. A contract is formed by consent of the parties through offer and acceptance. LSA-C.C. art. 1927. A party claiming the existence of a contract has the burden of proving that the contract was perfected between himself and his opponent.
 
 Enterprise Property Grocery, Inc. v. Selma, Inc.,
 
 38,747 (La.App.2d Cir.9/22/04), 882 So.2d 652,
 
 writ denied,
 
 2004-2640 (La.12/17/04), 888 So.2d 876;
 
 Pennington Construction, Inc. v. R A Eagle Corp.,
 
 94-0575 (La.App. 1st Cir.3/3/95), 652 So.2d 637.
 

 Under Louisiana law, the formation of a valid and enforceable contract requires capacity, consent, a certain object and lawful cause.
 
 Worley v. Chandler,
 
 44,047 (La.App.2d Cir.3/4/09), 7 So.3d 38;
 
 Hanger One MLU, Inc. v. Unopened Succession of Rogers,
 
 43,120 (La.App.2d Cir.4/16/08), 981 So.2d 175. The court must find that there was a “meeting of the minds” of the parties to constitute consent.
 
 Mathews v. Mathews,
 
 43,806 (La.App.2d Cir.12/17/08), 1 So.3d 738;
 
 Hanger One MLU, supra.
 
 The trial court’s conclusion regarding the existence of a contract is a finding of fact which may not be disturbed on appeal unless it is found clearly wrong.
 
 Hanger One MLU, supra; Enterprise Property Grocery, supra; Baldwin v. Bass,
 
 28,984 (La.App.2d Cir.12/11/96), 685 So.2d 436,
 
 writ denied,
 
 97-0111 (La.3/7/97), 690 So.2d 20.
 

 In the instant case, in granting summary judgment in favor of 18plaintiffs, the district court stated:
 

 I do find that there is definitely a question of fact as to what the royalty should be.
 

 The plaintiff indicates, as I have repeated time and time again, that he was under the impression that the royalties were going to be 25 percent. The Defendants were under the impression that the royalty would be 20 percent. The lease agreement itself says one-eighth. Therefore, we do not have a meeting of the minds as far as what the royalties were going to be.
 

 [[Image here]]
 

 Regardless of whether he signed it without reading or whether he read it, there is still no meeting of the minds as to royalties.
 

 
 *756
 
 [[Image here]]
 

 We agree. JPD concedes that the amount of royalties stated in the written lease was incorrect. Thus, whether Adams read the lease before signing it is of no moment. As stated above, the written lease provided that the amount of royalties would be one-eighth of production. JPD contends that the lease should have stated that the amount of royalties would be one-fifth (20%) of production, while Adams testified that he and Pierce agreed that the royalty percentage would be one-fourth (25%) of production. Therefore, based upon this record, we find that there was no “meeting of the minds” or mutual consent between the parties with regard to the amount of royalties. Accordingly, we find no error in the district court’s finding that the mineral lease was null.
 

 CONCLUSION
 

 For the reasons set forth herein, we affirm the district court’s summary judgment in favor of plaintiffs, Vernon D. Adams and Glenda P. |!(Adams. Costs of the appeal are assessed to defendant, JPD Energy, Inc.
 

 AFFIRMED.